IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARILYNN E. RUMPF, JR.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | Civil Action No. 11-125-GMS |

## MEMORANDUM

### I. INTRODUCTION

The plaintiff Marilynn E. Rumpf, Jr. ("Rumpf") filed an application for disability insurance benefits ("DIB") on October 23, 2007, pursuant to Title II of the Social Security Act. (D.I. 9 at 10.) The Social Security Administration ("SSA") denied Rumpf's DIB application initially and upon reconsideration. (*Id.* at 71–76, 79–83.) Rumpf requested a rehearing before an Administrative Law Judge ("ALJ"), which took place on July 28, 2009. (*Id.* at 29–67). On August 13, 2009, the ALJ, Melvin D. Benitz, issued a written decision denying Rumpf's DIB claim. (*Id.* at 10–28.) Subsequently, the Appeals Council denied Rumpf's request for review. (*Id.* at 1–3.)

On February 9, 2011, Rumpf filed this action against defendant Michael J. Astrue, former Commissioner of Social Security ("the Commissioner"),[1] for a review of the final decision

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after briefing began. Although under Federal Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g) no further proceedings are necessary to continue this action.

denying her DIB application. (D.I. 1.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 12; D.I. 14.) For the reasons that follow, the court will: (1) deny the Commissioner's motion for summary judgment; and (2) grant in part Rumpf's motion for summary judgment. The court remands this matter for further administrative proceedings.

## II. BACKGROUND

Rumpf was born on October 23, 1951. (D.I. 9 at 112.) Rumpf's medical history was unremarkable until she was diagnosed with thyroid cancer in 1984. (*Id.* at 305.) Rumpf underwent a thyroidectomy and continues thyroid replacement therapy to regulate her Thyroid-Stimulating Hormone levels. (*Id.*) Furthermore, Rumpf was diagnosed with chronic fatigue syndrome in 1990. (*Id.* at 36, 275.) Rumpf filed an application for DIB in 1990, and the SSA awarded her DIB from March 1991 to January 1995,[2] finding her disabled as of September 6, 1990. (*Id.* at 126.) Rumpf testified that she received DIB during this period due to chronic fatigue syndrome, however, according to SSA records, DIB benefits were awarded based on a primary diagnosis of "Anxiety Disorders." (*Id.* at 51, 126.) The record underlying Rumpf's prior successful DIB is not in the current record. (*Id.* at 141.)

Between 1994 and 1998 Rumpf's conditions improved and she worked as a payroll clerk at Prosort LLC and as a temp at Advanced Staffing. (*Id.* at 59–61, 132–33, 146.) Rumpf's period of work ended in December 1997 when she was diagnosed with stage 1 carcinoma of the left breast. (*Id.* at 305.) Rumpf participated in radiation therapy and underwent treatment with Tamoxifen until February 2003. (*Id.* at 305–06.)

---

[2] Rumpf received monthly benefits through January 1998, however, the SSA determined the benefits received after 1995 were an overpayment. (D.I. 9 at 126.) In 2007, Rumpf negotiated a repayment plan for the overpayment. (*Id.*)

2

Rumpf applied for DIB again on October 23, 2007, alleging disability beginning April 1, 1998. (*Id.* at 10.) Since Rumpf last met the insured status requirements of the Social Security Act on June 30, 2003, the "relevant period" for determining Rumpf's disability was April 1, 1998 through June 30, 2003. (*Id.* at 12.) Rumpf alleged that her limiting conditions included "depression, chronic fatigue syndrome, headaches, neck and back injuries, dizziness, and breast and thyroid cancer." (*Id.* at 71.)

## A. Medical Assessments and Records Pertaining to the Relevant Period

### 1. Degenerative Disc Disease

On July 5, 2002, an imaging study of Rumpf's lumbar spine revealed mild spondylosis of the lumbar spine with a small central disc protrusion at L4-L5. (*Id.* at 347–51.) Furthermore, mild osteoarthritis changes of the facet joints were noted at the L4-L5 and L5-S1 levels. (*Id.*) An MRI of the thoracic spine revealed a left lateral disc herniation at T11-T12. (*Id.*) On August 9, 2003, Dr. Philip Schwartz observed that Rumpf had a full range of motion. (*Id.* at 275.)

### 2. Chronic Fatigue Syndrome

Rumpf's chronic fatigue syndrome first manifested in 1990. (*Id.* at 186.) Rumpf's neurologist, Dr. Alan J. Fink, noted on June 19, 2002 that Rumpf's chronic fatigue syndrome had "improved somewhat until the recent several months." (*Id.* at 364.) On July 15, 2003, Dr. Schwartz indicated that non-restful sleep, rather than an inflammatory disease, could have caused Rumpf's diffuse polyarthralgias. (*Id.* at 13.) In October 2004, Rumpf had a serious fall that increased the severity of her impairments, causing "a relapse of chronic fatigue syndrome." (*Id.* at 35–36.) The events following Rumpf's October 2004 fall occurred after the relevant period and are irrelevant to this decision. (*Id.*)

3

### 3. Neuropathic Pain

Dr. Fink examined Rumpf on July 26, 2002 in response to Rumpf's complaint of neuropathic pain. (*Id.* at 342.) Rumpf complained of left ankle pain and intermittent electric-like pain in the thighs, legs and feet. (*Id.*) According to Dr. Fink, Rumpf responded well to treatment with Neurotonin throughout the relevant period without an increase in pain. (*Id.* at 336–41.)

### 4. Status Post Breast Cancer Treatment

Following Rumpf's December 1997 breast cancer diagnosis, she participated in radiation therapy and underwent treatment with Tamoxifen. (*Id.* at 305–06.) On October 24, 2000, a bilateral mammogram revealed no evidence of malignancy. (*Id.* at 300.) On March 13, 2001, Rumpf reported intermittent numbness in the left upper extremity following her left lumpectomy and lymph node resection, however, Dr. Barry L. Bakst noted her muscle strength was symmetric and within functional limits. (*Id.* at 228–31.) Dr. Irving Berkowitz discontinued Rumpf's Tamoxifen treatment in February 2003. (*Id.* at 306.) Rumpf testified that she was not to lift heavy objects due to her previous cancer and lymph node removal, however, the medical records fail to reveal that any of Rumpf's treating physicians limited her from lifting heavy objects. (*Id.* at 16.) Rumpf's breast cancer returned October 2008, however, these medical records fall outside the relevant period for determining her disability. (*Id.*)

### 5. Hyperthyroidism

Following Rumpf's thyroidectomy in 1984, she began treatment with .2 milligrams of Synthroid daily. (*Id.* at 186.) Throughout the relevant period, Rumpf's Synthroid dosage decreased and her Thyroid-Stimulating Hormone levels remained in normal range. (*Id.* at 16.)

4

Rumpf testified that she experiences difficulty with her energy levels due to hyperthyroidism, however, the medical record does not reveal significant episodes involving reduced energy arising from Rumpf's hyperthyroidism during the relevant period. (*Id.*)

### 6. Headaches and Cervical Degenerative Disc Disease

Dr. Bakst examined Rumpf on March 13, 2001 for cervical spine pain and headaches. (*Id.* at 228–31.) An MRI revealed a small disc protrusion at C4-C5 and a small right paracentral disc herniation at C5-C6. (*Id.*) Dr. Bakst diagnosed Rumpf with right paracentral disc herniation at C5-C6, suboccipital cephalgia, somatic dysfunction and myofascial pain. (*Id.*) During the relevant period, Rumpf's treatment with Vioxx lessened the frequency of her headaches and decreased her spine pain to 2 out of 10. (*Id.*) On July 5, 2002, an MRI of Rumpf's cervical spine revealed a new and small left lateral disc herniation at C4-C5 abutting the left ventral aspect of the spinal cord. (*Id.* at 17) An MRI of Rumpf's brain revealed no focal brain abnormalities or pathological enhancement, however, Virchow-Robin spaces appeared involving the right thalamus and right dorsal aspect of the pons. (*Id.*) Overall, during the relevant period, Rumpf sought little treatment for her cervical impairments and headaches. (*Id.*) Following Rumpf's October 2004 fall, her cervical treatment increased significantly, although those medical records fall outside the relevant period. (*Id.*)

### 7. Left Knee

On July 23, 2002, Rumpf's EMG and nerve conduction study of the lower extremities was within normal limits. (*Id.* at 344–46.) In addition, on February 25, 2003, an imaging study of Rumpf's left knee revealed minimal spurring involving the distal portion of the femur medially and the inferior portion of the patella. (*Id.* at 295.) Rumpf had a meniscal tear of her

left knee in September 2003 and sustained further damage to her knee following her October 2004 fall, however, these impairments follow the relevant period. (*Id.* at 18, 271.)

### 8. Anxiety and Depression

There is a lack of medical evidence surrounding Rumpf's mental health during the relevant period. (*Id.* at 20.) On September 20, 2002, Rumpf denied anxiety related symptoms to Dr. Ripu Hundal. (*Id.* at 251.) Rumpf testified that her depression began in 1990, however, Rumpf's treatment history reveals that she resumed mental health treatment on January 5, 2004, which is after the relevant period (*Id.* at 20, 305.) Psychologist Dr. Richard G. Ivins reported that Rumpf's depression, anxiety and concentration difficulties worsened after Rumpf's October 2004 fall. (*Id.* at 520–27.) Likewise, the record reveals that Rumpf began seeing Dr. John W. Dettwyler for psychological counseling in September 2005, following the death of her nephew. (*Id.* at 431, 567.) According to the ALJ, Rumpf's medically determinable mental impairments of anxiety and depression caused a minimal limitation in Rumpf's ability to perform basic mental work during the relevant period. (*Id.* at 20.) In making this evaluation, the ALJ considered four broad functional areas:[3] (1) daily living, (2) social functioning, (3) concentration, persistence or pace, and (4) decompensation. (*Id.*) The medical record as a whole, relevant to the time period at issue, does not support Rumpf's testimony about the extent of her mental impairments. (*Id.*)

Rumpf testified that she was seeing primary care physician, Dr. Seth Ivins,[4] for both chronic fatigue syndrome and depression. (*Id.* at 52–53.) On December 6, 2007, the SSA requested from Dr. Seth Ivins all Rumpf's records from 1998 through 2003. (*Id.* at 400.) The

---

[3] The four broad functional areas are found in the disability regulations for evaluating mental disorders and section 12.00C of the Listing of Impairment. (D.I. 9 at 20; 20 C.F.R. § 404, subpt. P, app. 1.) They are known as the "paragraph B" criteria. (D.I. 9 at 20.)

[4] Rumpf was treated by both Dr. Seth Ivins and Dr. Richard Ivins; therefore, a first name will be retained.

6

SSA sent the same request to Total Care Physicians, where Dr. Seth Ivins worked prior to 2004. (*Id.* at 276; D.I. 13 at 4 n.4.) Both Dr. Seth Ivins and Total Care Physicians submitted records in response to the requests. (*Id.* at 394–496, 276–91.) Those records do not contain Rumpf's alleged patient progress concerning chronic fatigue syndrome or depression between 1998 and 2002. (*Id.*) Dr. Seth Ivins' notes from Total Care Physicians do indicate, however, that he prescribed Effexor to treat Rumpf's depression on January 12, 2003, January 28, 2003, and March 9, 2003. (*Id.* at 277–79.)

Rumpf's representative submitted over 250 pages of records to supplement the documents obtained by the SSA, including two exhibits submitted after the ALJ hearing. (*Id.* at 510–788, 31.) None of these supplemental documents describe Dr. Seth Ivins' treatment of Rumpf's alleged depression or chronic fatigue syndrome during the relevant period. (*Id.* at 510–788.)

Dr. Pedro Ferreira, a State agency medical consultant, prepared a Psychiatric Review Technique Form on May 29, 2008. (*Id.* at 497.) Dr. Ferreira concluded that Rumpf's mental impairments were not severe. (*Id.*) The ALJ assigned "great weight" to Dr. Ferreira's opinion because it was consistent with the medical record as a whole. (*Id.* at 21.)

### B. The ALJ's Findings

On August 13, 2009, the ALJ concluded that Rumpf was not disabled. (D.I. 9 at 28.) At Step One of the sequential evaluation process, Rumpf was not found to have engaged in substantial gainful activity during the relevant period—April 1, 1998 to June 30, 2003. (*Id.* at 12.) At Step Two, the ALJ determined Rumpf had the following severe impairments: degenerative disc disease and chronic fatigue syndrome. (*Id.*) Rumpf's neuropathic pain, post

7

breast cancer treatment, hyperthyroidism, headaches, cervical degenerative disc disease, left knee, anxiety, and depression were found non-severe during the relevant period. (*Id.* at 24.)

At Step Three, the ALJ determined Rumpf did not have an impairment or combination of impairments that met one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*) Furthermore, the ALJ found that Rumpf had the "residual functional capacity to perform simple, routine, low stress, low concentration, low memory light work as defined in 20 CFR 404.1567(b)." [5] (*Id.* at 24.) In forming a 'residual functional capacity,' the ALJ follows a two-step process: (1) Determining whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain, and (2) Evaluating the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. (*Id.* at 25.) The ALJ found that the "medical record as a whole [did] not reflect that [Rumpf's] fatigue caused any impact on her ability to perform sustained work activities between 1990 and June 2003." (*Id.*) Furthermore, with regards to Rumpf's degenerative disc disease, the ALJ noted that "[Rumpf's] range of motion was not affected during the relevant time period." (*Id.*) Nevertheless, the ALJ assigned simple, routine, low stress, light work to address Rumpf's subjective complaints of impairment, fatigue, and pain. (*Id.* at 25–26.)

At Steps Four and Five, the ALJ found that Rumpf was unable to perform any past relevant work; nonetheless, there were a significant number of jobs in the national economy that Rumpf could perform. (*Id.* at 27.) Relying on the Vocational Expert's testimony, the ALJ

---

[5] Furthermore, Rumpf "could lift 10 pounds frequently, 20 pounds on occasion, sit for 30 minutes, stand for 30 minutes consistently on an alternative basis, 8 hours a day, 5 days a week, avoiding heights and hazardous machinery, temperature and humidity extremes, with no repetitive neck turning and mildly limited to push and pull in the lower extremities but able to attend tasks and complete schedules." (D.I. 9 at 24.)

8

concluded that Rumpf could serve as a recreation aide, a garment sorter, or a fruit cutter. (*Id.* at 27–28.) Thus, the ALJ concluded that Rumpf was not disabled from April 1, 1998 through June 30, 2003. (*Id.* at 28.)

## III. STANDARD OF REVIEW

### A. The ALJ's Decision

A reviewing court must uphold an ALJ's decision if it is supported by "substantial evidence." 42 U.S.C. § 405(g). "Where the ALJ's findings of fact are supported by substantial evidence," the court is "bound by those findings, even if . . . [it] would have decided the factual issue differently." *Fargonoli v. Massanari*, 247 F.3d 34, 38 (3d. Cir. 2001). "Substantial evidence" means "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The inquiry is not whether the reviewing court would have made the same determination but, rather, whether the ALJ's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d. Cir. 1988). "Overall this test is deferential, and we grant similar deference to agency inferences from fact if those inferences are supported by substantial evidence, even where this court acting de novo might have reached a different result." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In Social Security cases, this substantial evidence standard applies to motions for summary judgment. *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d. Cir. 1988).

## IV. DISCUSSION

Rumpf challenges the ALJ's decision on two grounds. (D.I. 13 at 2.) First, Rumpf claims the ALJ failed to fully and fairly develop the record by not obtaining Dr. Seth Ivins' treatment records from 1998 to 2002 regarding Rumpf's chronic fatigue syndrome and depression. (*Id.* at 2, 7.) Second, Rumpf claims the ALJ failed to fully and fairly develop the record by not securing the records underlying Rumpf's prior successful disability file. (*Id.* at 2.)

### A. Applicable Standards for Determining Disability

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. 20 C.F.R. § 404.131. In determining whether a person is disabled, the ALJ performs a sequential five-step analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* 20 C.F.R. § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled." If a claimant does not suffer from a listed impairment or its

10

equivalent, the analysis proceeds to steps four and five.

   4. If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

   5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he or she is capable of performing other work in the national economy. If he or she is incapable, a finding of disability will be entered. Conversely if the claimant can perform other work, he will be found "not disabled."

*Cunningham v. Apfel*, No. 00-693-GMS, 2001 WL 1568708, at *4 (D. Del. Dec. 7, 2001) (paraphrasing the five-step process for determining disability); *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the claimant bears the burden of proof. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). At step five, however, the burden shifts to the Commissioner to determine whether there is other substantial gainful employment in the national economy that the claimant can perform. *Id.* Substantial gainful employment is defined as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity that exists in the national economy. *See* 42 U.S.C. § 423(d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

### B. Duty to Develop

Both the claimant and the Commissioner have an obligation to develop the record. The burden ultimately remains with the claimant to provide evidence of his or her impairments and its severity. *See Bell v. Barnhart*, 218 F. Supp. 2d 583, 593 (D. Del. 2002); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence or the existence thereof as the Commissioner of Social Security may require."). Furthermore, the claimant's representative is obligated to "[a]ct with reasonable promptness to obtain the information and evidence that the claimant must submit in support of his or her claim, and forward the same to [the SSA] for consideration as soon as practicable." 20 C.F.R. § 404.1740(b)(1). As the Supreme Court has noted, "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The ALJ, however, does have a "duty to develop a full and fair record in social security cases" to ensure his or her decision is supported by substantial evidence. *See Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995); 20 C.F.R. § 404.1512(d) ("[The SSA] will develop [the claimant's] complete medical history for at least 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary."). The ALJ's duty to develop a full and fair record requires the ALJ to "secure relevant information regarding a claimant's entitlement to social security benefits." *Ventura*, 55 F.3d at 902. Moreover, the SSA will make "every reasonable effort" to help the claimant retrieve his or her medical records. 20 C.F.R. § 404.1512(d). A "reasonable effort" entails making an initial request for evidence from the claimant's medical source and, if the evidence

12

has not been received after a certain period of time, making a follow-up request to obtain medical evidence necessary to make a determination. 20 C.F.R. § 404.1512(d)(1). Lastly, although an ALJ has a higher burden to develop the record when the claimant is *pro se*, the ALJ's obligation to fully and fairly develop the record is not excused when a claimant has representation. *See Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005).

### 1. Dr. Seth Ivins' Treatment Records

Rumpf argues the evidentiary gap in her treatment records, pertaining to Dr. Seth Ivins' alleged treatment of chronic fatigue syndrome and depression between 1998 and 2002, not only triggered the ALJ's duty to further develop the record, but also resulted in prejudice to Rumpf. (D.I. 13 at 7.) The Commissioner argues that the ALJ satisfied its obligation to assist Rumpf in obtaining Dr. Seth Ivins' treatment records. (D.I. 15 at 8.) The court accepts the Commissioner's argument.

The ALJ has a duty to further develop the record if the "incomplete record reveals evidentiary gaps which result in prejudice to the claimant." *Bell v. Barnhart*, 218 F. Supp. 2d 583, 593 (D. Del. 2002) (citing *Gauthney v. Shalala*, 890 F. Supp. 401, 410 (E.D. Pa. 1995)). Speculation, however, concerning the existence of medical records will not merit a remand. *See Bell*, 218 F. Supp. at 593 (finding claimant's suggestion that other records may exist insufficient to trigger the ALJ's duty to further develop the record).

Rumpf testified she saw Dr. Seth Ivins "all along" for chronic fatigue syndrome and depression and thus argues there must be missing treatment records during the relevant period. (D.I. 9 at 52–53.) At the ALJ hearing, however, Rumpf's representative did not claim any

13

favorable medical evidence existed that was not part of the record before the ALJ. (*Id.* at 29–67.) To the contrary, Rumpf admitted to the Appeals Council that it was "not surprising" the ALJ found that Dr. Seth Ivins' records do not support Rumpf's allegations as to the severity of her depression and anxiety "since he is a primary care doctor, not a psychiatrist." (*Id.* at 184.) Rumpf contradicts her argument before the Appeals Council, contending that Dr. Seth Ivins' "missing" records are so crucial that their absence resulted in prejudice. Rumpf had ample opportunity to fulfill her evidentiary burden and submit additional evidence to supplement the SSA's findings; in fact, Rumpf's representative submitted over 250 pages of medical records, including two exhibits submitted after the ALJ hearing. (*Id.* at 510–788.) None of these documents, however, related to Dr. Seth Ivins' treatment of chronic fatigue syndrome or depression during the relevant period. (*Id.*)

The ALJ made "every reasonable effort" to help Rumpf retrieve medical records from Dr. Seth Ivins during the relevant period. *See* 20 C.F.R. § 404.1512(d). The SSA sent two records requests seeking Dr. Seth Ivins' treatment records from 1998 through 2003; one addressed to Dr. Seth Ivins himself and another to his medical practice, Total Care Physicians. (D.I. 9 at 276, 400.) Both Dr. Seth Ivins and Total Care Physicians submitted records in response to the requests. (*Id.* at 394–496, 276–91.) Those records do not contain Rumpf's alleged patient progress concerning chronic fatigue syndrome or depression between 1998 and 2002. (*Id.*) Rumpf alleges that "[d]eveloping a record in the context of a Social Security Disability case means more than simply requesting records," without supporting the proposition with authority. Furthermore, despite the lack of objective medical evidence concerning Rumpf's chronic fatigue, the ALJ nevertheless assigned simple, routine, low stress, light work to address Rumpf's

subjective complaints of impairment, fatigue, and pain. (*Id.* at 25–26.) By incorporating these subjective limitations, the ALJ accounted for the alleged "evidentiary gap" and afforded Rumpf the benefit of the doubt. *See Dougherty v. Astrue*, 715 F. Supp. 2d 572, 585–86 (D. Del. 2010).

Thus, the ALJ satisfied its obligation to assist Rumpf in fully and fairly developing the record with regards to obtaining Dr. Seth Ivins' treatment records during the relevant period.

### 2. **Rumpf's Prior Successful Disability File**

Rumpf argues that her prior disability file is both relevant and necessary to determining her eligibility for DIB. (D.I. 13 at 8, 11.) The Commissioner argues that the ALJ had no obligation to consider Rumpf's prior disability file, which closed three years before the relevant period in the instant case. (D.I. 15 at 11.) The court agrees with Rumpf's assertion. Although the prior award of disability benefits may not be dispositive, the records supporting that determination may be relevant in determining current eligibility for benefits. Therefore, because the ALJ did not obtain and consider the prior determination and its bases, the court shall remand for purposes of developing the record by obtaining and evaluating the evidence that supported the prior disability determination.

The "existence of a prior established disability is highly relevant when the nature of that disability appears to be the very same cause of the alleged disability then under examination." *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984); *see also Wooten v. Astrue*, 2012 U.S. Dist. LEXIS 178413, *9 (E.D. Pa. Dec. 17, 2012).

The ALJ knew Rumpf had previously been found disabled and that her benefits had been discontinued because she returned to work. (D.I. 9 at 51.) Rumpf testified that she received prior DIB due to chronic fatigue syndrome, however, according to SSA records, Rumpf received

15

the prior DIB based on a primary diagnosis of "Anxiety Disorders." (*Id.* at 51, 126.) Given this discrepancy, the ALJ should have obtained and considered the medical records that formed the basis for the earlier finding of disability to resolve the differences between Rumpf's testimony and the SSA records. If Rumpf correctly testified that her prior DIB concerned the severity of her chronic fatigue syndrome, those records would be "highly relevant," as the nature of that disability appears to be the same as the current alleged disability. *See Mimms* 750 F.2d at 185. In addition, although Rumpf failed to list 'anxiety' as a limiting condition on her subsequent application for DIB, the ALJ nonetheless evaluated Rumpf's anxiety in his decision. (*Id.* at 18-21.) The ALJ did not credit Rumpf's testimony concerning her mental impairment limitations, as it was "inconsistent with the medical record and medical events in her treatment history." (*Id.* at 21.) An evaluation of the earlier medical evidence could have an effect on the ALJ's credibility and disability determinations. *See Wooten v. Astrue*, 2012 U.S. Dist. LEXIS 178413, *17 (E.D. Pa. Dec. 17, 2012). Furthermore, the ALJ's obligation to fully and fairly develop the record is not excused because Rumpf was represented by a paralegal during the ALJ hearing. *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005).

Without the medical evidence that supported Rumpf's earlier claim for benefits, the record was not fully developed. Therefore, the court shall remand the case for development of the record, particularly the testimony and evidence that supported Rumpf's prior claim.

## V. CONCLUSION

For the foregoing reasons, the court grants in part Rumpf's motion for summary judgment and denies the Commissioner's motion for summary judgment. This matter is remanded for additional administrative proceedings.

Dated: July 9, 2015

_____
UNITED STATES DISTRICT COURT